**Opinion issued November 13, 2018**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-17-00659-CR**

———————————

**KOMBILA ESSONGUE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1518925**

## MEMORANDUM OPINION

A jury convicted appellant, Kombila Essongue, of the first-degree felony offense of aggravated robbery.[1] Pursuant to an agreement between appellant and the

---

1      *See* TEX. PENAL CODE ANN. § 29.03(a)(2) (West 2011).

State, the trial court assessed appellant's punishment at twenty-five years' confinement. In two issues, appellant contends that the State failed to present sufficient evidence to establish (1) his identity as a perpetrator of the robbery and (2) his criminal responsibility for the offense under the law of parties.

We affirm.

## Background

In the summer of 2016, Qiong Liu worked at a real estate office across the street from the Chinese Community Center in southwest Houston, near the Chinatown district and the West Sam Houston Tollway. On July 25, 2016, Liu drove her black Lexus SUV to the community center's parking lot and spent her lunch break in her vehicle, eating lunch and playing games on her cell phone. Liu kept the driver's side door slightly open to allow a breeze to circulate through the car.

While Liu was sitting in her car, three men approached the Lexus. The first man opened the driver's side door all the way and demanded that Liu get out of the vehicle. Liu noticed a second man, who said nothing but pointed a gun in her direction. Liu realized that she was "in trouble," and she got out of the vehicle. When she was outside of the Lexus, she noticed a third man, later identified as appellant, who climbed into the backseat of her car. Liu tried to plead with appellant, asking him to "stop the car," but he merely smiled at her as he got into the backseat. Liu

testified that she and appellant made eye contact, and she estimated that their interaction lasted approximately thirty seconds.

The three men drove away in Liu's car, and Liu briefly ran after her car. The trial court admitted a surveillance video from the Chinese Community Center that depicted Liu's car driving away and Liu chasing after the car. The three men inside of her car could not be seen on the surveillance video. Liu ran into the Chinese Community Center and called 9-1-1. On the 9-1-1 call, Liu mentioned seeing a woman driving a car, and at trial she testified that, when she got out of her car at gunpoint, she saw a woman sitting in a vehicle nearby, and this woman quickly followed behind the men when they drove away in Liu's car.

Houston Police Department (HPD) Officer K. Canales testified that he works in a gang unit based on the west side of Houston. Officer Canales's unit had received several reports in late July 2016 that a stolen vehicle, later identified as Liu's Lexus, was involved in committing several offenses in the general area of the Chinatown district and the West Sam Houston Tollway. The unit, which was composed of a mixture of plainclothes officers and officers in uniform driving marked patrol cars, went to the area on August 1, 2016, one week after Liu's vehicle was stolen, to search for the vehicle. Officer Canales was in plainclothes and an unmarked vehicle when he saw a black Lexus SUV that matched the description of the target vehicle in an apartment complex. One of the other plainclothes officers notified Officer

3

Canales that three men got into the car, and Canales started following the Lexus as it left the apartment complex. The Lexus had a paper license tag, which appeared suspicious,[2] and when Officer Canales witnessed the driver of the Lexus roll through a stop sign, Canales requested that one of the uniformed officers in his unit make a traffic stop of the Lexus.

Officer J. Baker was one of the uniformed officers involved in the search for the stolen Lexus, and he and his partner responded to Officer Canales's request to conduct a traffic stop of the Lexus. Officer Canales continued to observe the Lexus, and he testified that the Lexus did not stop when Officer Baker turned on his emergency lights. The driver of the Lexus pulled into an apartment complex on Corporate Drive, but instead of stopping, the driver pulled back onto the road and quickly drove away before turning into another apartment complex along Corporate Drive. After they turned into the second apartment complex, three men jumped out of the Lexus, which continued to roll until it crashed into a fence, and fled the area on foot. Officer Canales apprehended one of the men along Corporate Drive, and Officer Baker followed another man through the apartment complex until another officer apprehended that man near a large fence. Officers secured and photographed

---

[2] Officer Canales testified that, with stolen cars, it is a common practice for the perpetrators to take the actual license plate off of the vehicle and replace it with a paper tag so that, if the vehicle is stopped and an officer checks the number on the paper tag, the vehicle will not immediately register as stolen.

the Lexus, which included taking a picture of the paper tag attached in place of the license plate and a picture of a pistol that was discovered inside the backseat console.

While the foot chase was occurring, Officer Baker was able to broadcast a physical description of the driver of the Lexus. He gave a general description concerning clothing and stature, but the primary identifying feature of the driver was his dreadlocks, which was a different hairstyle from the other two men who had fled the Lexus. Officer J. Sicola heard the broadcast and help set up a perimeter a few blocks away along the West Sam Houston Tollway. Officer Sicola observed a man matching the description contained in the broadcast walking along the frontage road of the West Sam Houston Tollway. He took this man into custody and drove him back to the apartment complex where the Lexus had crashed. Officer Baker identified the man apprehended by Officer Sicola as the driver of the Lexus. This man was later identified as appellant. Officer Baker identified appellant in court as the driver of the Lexus, and he noted that, at the time of trial, appellant no longer had the distinctive dreadlocks that he had had at the time of his arrest.

Liu identified the Lexus that the officers recovered as her vehicle.[3] The trial court admitted a picture of the interior of the vehicle that displayed a gun resting on the backseat console, and Liu testified that this gun looked similar to the gun pointed

---

[3]     In one of the photographs of Liu's car admitted into evidence, a paper tag can be seen covering the license plate. When the State asked Liu about this tag, she testified that she did not put that tag on her vehicle.

5

at her during the robbery. Liu also testified that, after her vehicle was recovered, she viewed three photo-arrays with a detective. The third photo-array contained appellant's picture, and Liu circled that picture and identified appellant as the person who climbed into the backseat of her car. Liu stated that she recognized him because of his "big eyes" and boney facial structure. Liu did not positively identify appellant in court, although she stated that appellant looked "very similar" and that his "[f]ace [looked] like it changed a little bit." On cross-examination, Liu testified that she told the detective showing her the photo-arrays that she was "80 percent" certain about her identification.

Officer T. Fontenot, with the HPD Robbery Division, was assigned to this case after the recovery of the Lexus and the arrest of appellant. Officer Fontenot testified that it was not unusual for someone to steal a car and then still have that car in their possession a week later. He also testified that he interviewed Liu and showed her three photo-arrays. Liu did not identify anyone in the first two photo-arrays. Liu identified appellant's photograph in the third photo-array, and she told Officer Fontenot that the person she identified had participated in the robbery by climbing into the backseat of the Lexus and smiling at her as the car drove away. She also told Officer Fontenot that she was 80 percent certain about her identification. Officer Fontenot, like Officer Baker, testified that appellant's appearance had changed

6

during the time between his arrest and the time of trial. Specifically, appellant had cut off his dreadlocks.

Officer Fontenot also testified that he spoke with appellant and appellant offered an alibi; namely, that he had been at work at Mr. Clean Car Wash on Richmond Avenue, north of the Westpark Tollway and west of the West Sam Houston Tollway, at the time Liu was robbed. Officer Fontenot reviewed documentation from the car wash that included both a handwritten and a computer-generated timecard for appellant. The timecards reflected that, on July 25, 2016, appellant clocked in to work at either 1:22 or 1:23 p.m.[4] Officer Fontenot testified that, based on the surveillance video from the Chinese Community Center, the robbery of Liu occurred at 1:03 p.m. He testified that several routes could be taken from the Chinese Community Center where Liu was robbed to the Mr. Clean Car Wash where appellant worked, and that the longest route was projected to take fourteen minutes. He therefore concluded that it was reasonable for appellant to have been involved in the robbery at 1:03 p.m. and still be able to clock in to work at 1:23 p.m.

Officer Fontenot also reviewed a surveillance video from the car wash. The surveillance video depicted a female employee of the car wash working as a cashier

---

[4] The handwritten timecard, completed by appellant, stated a clock-in time of 1:22 p.m., whereas the computer-generated timecard, completed when the car wash's cashier clocked appellant in, stated a clock-in time of 1:23 p.m.

and James Le, the owner and manager of the car wash, also standing behind the cash register. The video showed appellant walk into the room and clock in with the cashier at 1:22 p.m. Officer Fontenot spoke with Le, who confirmed that appellant had not been at work on July 25 prior to 1:22 p.m. Based on Liu's identification, the chase and subsequent recovery of the Lexus, and the information received from the car wash, Officer Fontenot concluded that appellant was a party to the robbery of Liu.

Le testified that the car wash workers were independent contractors who were not required to work all of the hours that they were scheduled to work. He stated that because the car wash business was unpredictable, primarily due to the weather, his workers would arrive at the car wash and clock in when cars arrived, and they could clock out whenever they liked.[5] He described the clock-in process, testifying that the cashier would clock the worker in on the computer and tell the worker the time, and the worker would handwrite his name and clock-in time on a chart kept by the cash register. For the worker to be paid, the computer-generated clock-in time and the handwritten clock-in time would have to match, with allowances made for slight discrepancies. Le testified that it was not unusual for his workers to clock in for an

---

[5] The State introduced a schedule from the car wash reflecting that appellant was scheduled to work on Mondays—which included July 25, 2016, the date of the robbery of Liu—from 9:00 a.m. to 6:00 p.m. Le testified that, despite the schedule, appellant would not have been required to arrive at work precisely at 9:00 a.m., and he would not have been required to stay at work until 6:00 p.m.

hour or two in the morning, take a lengthy break, and clock back in during the afternoon.

Le testified that, on July 25, appellant was scheduled to work as a "prep" worker, which is an important position that helps control the flow of cars. Le recalled that the car wash was short-handed on that particular day, and he asked the cashier where his prep workers were. Right at that time, appellant walked in from the parking lot to clock in, and when Le asked appellant why he was late, appellant responded, "I [had] something to do." Le testified that he saw appellant being dropped off at the car wash. He also testified that he had not seen appellant at the car wash earlier that day, and he specifically stated that he looked in the workers' break room to find a prep worker but could not find anyone, which is when he decided to speak to the cashier. Le testified that July 25, 2016, was a sunny day, and thus weather would not have prevented his workers from arriving at work.

Appellant called Adam Garcia, a former manager at the Mr. Clean Car Wash, to testify on his behalf. Garcia testified that appellant typically arrived at work early, around 8:00 or 8:30 a.m., and that sometimes he would be at work for awhile without getting paid because the workers could not clock in until a car had arrived to be washed. He testified that appellant arrived at work around 8:45 or 9:00 a.m. on July 25, 2016. On cross-examination, Garcia testified that a computer was not used to clock workers in during July 2016, and workers would only handwrite their times

9

on a chart. He testified that the computer-generated timesheet for appellant that had been entered into evidence was fake. Garcia also testified that, as a manager, he would typically retrieve workers from the break room when cars arrived at the car wash, and he stated that appellant was in the break room prior to his clocking in on July 25, 2016.

Appellant's stepfather, Pedro Ekumu, also testified on his behalf. Ekumu testified that he lived in an apartment with his wife, appellant, and appellant's sister, and that, on July 25, 2016, appellant left the apartment around 8:00 a.m. to go to work. On that morning, appellant told his parents that he did not have money for transportation, so appellant and his mother went to a local store to make change so appellant would have money for bus fare. On cross-examination, Ekumu testified that his wife returned to the apartment after going to the store with appellant, and she told Ekumu that she had left appellant at a bus stop.

The jury charge authorized the jury to convict appellant as both a primary actor and under the law of parties. The jury found appellant guilty of the offense of aggravated robbery. Pursuant to an agreement between appellant and the State, the trial court assessed appellant's punishment at twenty-five years' confinement. This appeal followed.

10

**Sufficiency of the Evidence**

In his first issue, appellant contends that the State failed to present sufficient evidence establishing his identity as one of the men who robbed Liu. In his second issue, he contends that the State failed to present sufficient evidence that he was criminally responsible for the offense under the law of parties.

*A.     Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Griffin v. State*, 491 S.W.3d 771, 774 (Tex. Crim. App. 2016). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). The jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Rivera v. State*, 507 S.W.3d 844, 853–54 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Leroy v. State*, 512 S.W.3d 540, 543 (Tex. App.—Houston [1st

Dist.] 2016, no pet.). We give great deference to the jury's credibility determinations. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination."). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

## B. *Identity*

The State must prove identity—that the accused is the person who committed the charged offense—beyond a reasonable doubt. *Wiggins v. State*, 255 S.W.3d 766, 771 (Tex. App.—Texarkana 2008, no pet.); *Smith v. State*, 56 S.W.3d 739, 744 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). The State may prove identity by "either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence." *Gardner*, 306 S.W.3d at 285; *Smith*, 56 S.W.3d at 744.

Although a direct in-court identification of the defendant is the "preferred procedure" for establishing identity, it is not the only means by which the State can prove the identity of the accused. *Wiggins*, 255 S.W.3d at 771; *see Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (stating that eyewitness identification is not necessary to establish identity). If there is no in-court identification of the defendant as the perpetrator of the offense, "[t]he sufficiency of the evidence is then determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused." *Wiggins*, 255 S.W.3d at 771; *Clark v. State*, 47 S.W.3d 211, 214 (Tex. App.—Beaumont 2001, no pet.) (stating that even if no eyewitness can identify defendant as perpetrator, if other evidence shows defendant is perpetrator, failure of complainant to make positive in-court identification does not make verdict improper). The absence of an in-court identification "is merely a factor for the jury to consider in assessing the weight and credibility of the witnesses' testimony." *Wiggins*, 255 S.W.3d at 771.

Here, Liu testified that on July 25, 2016, she was eating lunch and playing games on her cell phone while sitting in her Lexus SUV parked in the parking lot of the Chinese Community Center when three men walked up to her car. The first man opened the driver's side door all the way and demanded that Liu get out of the vehicle; the second man said nothing but pointed a gun at Liu; and the third man also said nothing but made sustained eye contact with Liu and smiled at her as he ignored

her pleas and climbed in the backset of the Lexus. At trial, Liu did not give a positive in-court identification of appellant as the third man involved in the robbery; instead, she testified that he looked "very similar" and that it appeared as though his face had "changed a little bit." The State elicited testimony that after police had recovered Liu's vehicle and arrested appellant, who had been driving the vehicle, Liu viewed three photo-arrays and identified appellant's picture in the third photo-array. She told Officer Fontenot, and testified at trial, that at the time of viewing the photo-array, she was 80 percent certain that the person she identified was the man involved in the robbery who climbed in the backseat of her Lexus. She stated that she recognized this man due to his boney facial structure.

On appeal, appellant argues that Liu's equivocal identification of him as one of the robbers was not sufficient to support the jury's guilty verdict. Appellant cites several cases from our sister courts for the proposition that an uncertain in-court identification of the accused, without more, has been held insufficient to uphold a conviction and that corroborating evidence is needed in addition to an equivocal identification to support the verdict. *See, e.g.*, *Criff v. State*, 438 S.W.3d 134, 137–38 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Prihoda v. State*, 352 S.W.3d 796, 803 (Tex. App.—San Antonio 2011, pet. ref'd); *Redwine v. State*, 305 S.W.3d 360, 366 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Here, however, there

is corroborating evidence, aside from Liu's identification, tying appellant to the charged offense.

Liu identified appellant's picture in a photo-array with "80 percent" certainty that he was the man who participated in the robbery by making eye contact with her and smiling at her as he climbed into the backset of her Lexus. Although Liu did not positively identify appellant in court as one of the perpetrators, she did testify that he looked "very similar" and that it appeared as though his face had "changed a little bit." Two officers—Officer Baker and Officer Fontenot—testified that appellant's appearance had changed in between the time of his arrest and the time of trial. Specifically, appellant had cut off his distinctive dreadlocks.

The State also presented evidence that, toward the end of July 2016, there had been several reports of a black Lexus SUV involved in various criminal offenses in the Chinatown district of southwest Houston, near the Chinese Community Center where the robbery of Liu had occurred. A particular HPD unit was tasked with finding this vehicle, and on August 1, 2016, one week after the robbery of Liu, officers spotted the Lexus in a nearby apartment complex. Officers followed the Lexus, which had a suspicious looking paper tag affixed to it in place of the license plate, until the driver committed a traffic violation, and then a marked patrol unit attempted to conduct a traffic stop. The driver of the Lexus led the officers on a short chase before its occupants—three black men, who matched the general description

of the perpetrators that Liu had provided to officers—jumped out of the vehicle and fled, leaving the Lexus to crash into the fence of an apartment complex. A foot chase ensued, and officers eventually apprehended all three of the Lexus's occupants, including appellant, who was identified as the driver of the Lexus. Liu identified the Lexus as her vehicle. When shown a picture of a gun that was recovered from the backseat console, Liu stated that the gun looked like the one used to threaten her during the earlier robbery.

Thus, in addition to Liu's tentative pretrial identification of appellant as one of the robbers, the State presented evidence that, one week after the robbery, appellant was discovered driving Liu's vehicle, that the vehicle displayed a "suspicious" paper tag instead of an actual license plate, and that appellant fled from police, both in the Lexus and on foot. It is "well settled" that a defendant's unexplained possession of property recently stolen in a theft or burglary permits an inference that the defendant is the one who committed the theft or burglary. *See Rollerson v. State*, 227 S.W.3d 718, 725 (Tex. Crim. App. 2007); *Poncio v. State*, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006). Moreover, factfinders may permissibly draw an inference of guilt from the circumstance of flight. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007); *see also Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt.").

Appellant argues that the alibi evidence that he presented is such that no rational factfinder could find beyond a reasonable doubt that he was involved in the robbery of Liu. Specifically, he points to Garcia's testimony that, at the car wash where Garcia worked with appellant, workers could not clock in until a car arrived to be washed and thus workers often spent significant amounts of time at the car wash before they were officially clocked in. Appellant also points to Garcia's testimony that, on the day of the robbery, appellant arrived at the car wash around 9:00 a.m. and that, when appellant was seen on the car wash's surveillance video clocking in, he was walking from the workers' break room, not the parking lot.

The State, however, presented documentation in the form of the handwritten clock-in chart and the computer-generated time card, as well as the surveillance video from the car wash, that appellant clocked in at 1:22 p.m. on July 25, approximately twenty minutes after the robbery of Liu. The State also presented Le's testimony that he had not seen appellant at the car wash earlier in the day, that he had searched the break room for a "prep" worker such as appellant immediately before walking to the cashier, and that he saw a car drop appellant off at the car wash. Le saw appellant walk into the car wash from the parking lot, not from the break room. It was within the province of the jury to assess the credibility of Garcia and Le and to resolve the conflicts in their respective testimony. *See Williams*, 235 S.W.3d at 750 (stating that we may not re-evaluate weight and credibility of evidence

17

or substitute our judgment for that of factfinder). When, as here, the record supports conflicting inferences, we presume that the factfinder resolved the conflict in favor of the verdict, and we defer to that determination. *See Murray*, 457 S.W.3d at 448–49.

Although Liu's identification of appellant was equivocal, the State presented other evidence corroborating appellant's identity as one of the perpetrators of the robbery. *See Prihoda*, 352 S.W.3d at 803 (stating that uncertain in-court identification does not make verdict improper if there is other corroborating evidence; in such case, uncertainty of witness is relevant to weight of testimony and is for jury to consider). We conclude that, when viewing the evidence in the light most favorable to the verdict, as we must, a rational jury could have found beyond a reasonable doubt that appellant was one of the men involved in the robbery of Liu. We hold that the State presented sufficient evidence establishing appellant's identity as one of the perpetrators of the robbery.

We overrule appellant's first issue.

## C. *Law of Parties*

In his second issue, appellant contends that the State failed to present sufficient evidence that he was criminally responsible as a party to the aggravated robbery offense. Specifically, appellant argues that the evidence shows that he was

merely present at the scene of the robbery and fled with the suspects, not that he had a plan to commit the offense with the suspects.

To establish that appellant committed the offense of aggravated robbery, the State was required to prove that appellant, while in the course of committing theft of property owned by Liu, and with intent to obtain and maintain control of the property, intentionally and knowingly threatened and placed Liu in fear of imminent bodily injury and death while using and exhibiting a deadly weapon, namely, a firearm. *See* TEX. PENAL CODE ANN. § 29.03(a)(2) (West 2011); *id.* § 31.03 (West Supp. 2017) (setting out elements of theft). The jury charge also authorized the jury to convict appellant under the law of parties. Under the law of parties, a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2) (West 2011).

To determine whether a person is a party to an offense, we may look to events occurring before, during, and after the commission of the offense, and we may consider circumstantial evidence. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). "There must be sufficient evidence of an understanding and common design to commit the offense." *Id.* The mere presence of a person at the scene of the crime, or even flight from the scene, without more, is not sufficient to support a

19

conviction under the law of parties. *Id.* Evidence is sufficient to convict a defendant under the law of parties when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement. *Wooden v. State*, 101 S.W.3d 542, 546 (Tex. App.—Fort Worth 2003, pet. ref'd). The evidence must show that, at the time of the offense, "the parties were acting together, each contributing some part towards the execution of their common purpose." *Nelson v. State*, 405 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). Each fact need not point directly to the defendant's guilt, but the cumulative effect of the facts must be sufficient to support the conviction under the law of parties. *Gross*, 380 S.W.3d at 186.

Appellant argues that the State produced no evidence that the other robbery suspects and appellant had an agreement to commit the robbery. Appellant points out that Liu did not testify that appellant had a weapon or made any verbal threats to her, and he argues that Liu did not testify that his presence "contributed to her decision to relinquish her vehicle" because Liu had already gotten out of the Lexus when she saw appellant climb into the backseat. Appellant argues that the evidence reflects that he was merely present at the scene of the robbery and fled with the suspects. He also argues that his possession of the Lexus a week after the robbery does not demonstrate that he committed a culpable act before or during the robbery

20

because post-offense conduct alone cannot form the basis of a conviction under the law of parties.

However, Liu testified that three men approached her Lexus when it was parked in the Chinese Community Center parking lot. The first man opened the driver's side door all the way and ordered her to get out of the Lexus. The second man said nothing but pointed a gun at Liu, which prompted Liu to get out of her vehicle. The third man, later identified as appellant, also said nothing and did not have a gun, but he climbed into the backseat of the Lexus. Liu testified that she pleaded with appellant in an attempt to regain her vehicle, but appellant merely smiled at her from the backseat. After she got out of the Lexus, Liu observed another vehicle, driven by a woman, sitting nearby and then following quickly behind the Lexus as it drove away. One week later, appellant was discovered driving Liu's Lexus, and he fled from police officers both in the car and on foot when the officers tried to conduct a traffic stop. The Lexus had a fake paper tag attached where the license plate was supposed to be, and officers recovered a pistol from the backseat console. Liu testified that the pistol looked similar to the one used during the robbery.

The State thus presented evidence that appellant was part of a group of three men who approached Liu and demanded that she relinquish her vehicle. One of the men threatened Liu with a gun. When Liu pleaded specifically with appellant,

21

appellant ignored her pleas and smiled at her as the men drove away in her vehicle. Appellant was then later discovered driving her vehicle. The evidence established more than appellant's mere presence at the scene, and it established more than appellant's involvement after the robbery had been completed. *See Gross*, 380 S.W.3d at 186 ("There must be sufficient evidence of an understanding and common design to commit the offense."). We conclude that the State presented evidence from which a jury could rationally infer that appellant, when he approached Liu's vehicle with the other two men and climbed into the car while one of the men pointed a gun at Liu, acted with the intent to promote or assist the commission of the aggravated robbery and aided the other men in the commission of the robbery. *See* TEX. PENAL CODE ANN. § 7.02(a)(2); *Nelson*, 405 S.W.3d at 123 (stating that, to uphold conviction under law of parties, there must be some evidence that "the parties were acting together, each contributing some part towards the execution of their common purpose"). We therefore hold that the State presented sufficient evidence to support appellant's conviction under the law of parties.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).